MID-SOUTH ORDER BUYERS, INC.,
A CORPORATION, APPELLEE, V.
PLATTE VALLEY LIVESTOCK, INC.,
A CORPORATION, APPELLANT.

315 N.W.2d 229

Filed January 22, 1982. No. 43600.

Leo A. Knowles of McGrath, North, O'Malley & Kratz, P.C., for appellant.

Frank J. Mattoon of Martin, Mattoon, Matzke & Mattoon for appellee.

William G. Kanter, James Michael Kelly, and Raymond W. Fullerton; and Irene M. Solet, John J. Casey, and Helen C. Harris, amicus curiae.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, and HASTINGS, JJ.

CLINTON, J.

This is an action commenced in the District Court for Scotts Bluff County, Nebraska, by plaintiff, Mid-South Order Buyers, Inc. (Mid-South), against the defendant, Platte Valley Livestock, Inc. (Platte Valley), under the provisions of the Packers and Stockyards Act, 7 U.S.C. §§ 208 et seq. (1976), to enforce, under the provisions of § 210(f), a reparation order for the payment of money made by the Secretary of Agriculture through his delegate.

Mid-South, as its name implies, was engaged in the business, among others, of buying cattle for others on order for a commission and is a registrant under the act. Platte Valley is a dealer and market agency under the terms of the act, registered as such with the Secretary of Agriculture. It is engaged in the business of

buying and selling cattle on commission and on its own account.

The cause in the District Court was tried on motions for summary judgment filed by both Mid-South and Platte Valley. The evidence in support of the motions was the order and findings of the hearing examiner of the Department of Agriculture (the Secretary's delegate) and the record made in the hearing before the examiner, together with the foundational exhibits. The order of the examiner directed Platte Valley to pay Mid-South the sum of $26,156.04 with interest at 8 percent from April 1, 1973, until paid. The District Court denied the motion of Platte Valley, granted that of Mid-South, and entered judgment for Mid-South in the amount specified in the order of the examiner. Platte Valley has appealed to this court and raises the following issues: (1) The U.S. Department of Agriculture was without jurisdiction over this matter inasmuch as the action of Platte Valley on which the reparation order is based did not constitute a "practice" within the meaning of the Packers and Stockyards Act, § 208. (2) Irrespective of the jurisdiction of the Secretary of Agriculture over this dispute, the actions of Platte Valley were clearly lawful and do not, in any event, amount to an unlawful, unreasonable, or discriminatory practice, and such holding was contrary to law and unsupported by substantial evidence.

An understanding of the issues makes necessary a summary of the pertinent federal statutes and regulations as well as a summary of the facts as found by the hearing examiner.

We will first summarize the statutes and the regulations. Section 208(a) places the duty upon stockyard owners and market agencies to "establish, observe, and enforce just, reasonable, and nondiscriminatory regulations and practices in respect to the furnishing of stockyard services, and every unjust, unreasonable, or discriminatory regulation or practice is prohibited and declared to be unlawful." Section 209(a) makes any

person violating any provision of the chapter (act) liable to the person injured thereby for the full amount of damages sustained as a consequence of the violation. Liability under the act may be enforced by complaint to the Secretary of Agriculture as provided in § 210. An order of the Secretary for the payment of money may be enforced in any U.S. District Court or in any state court having general jurisdiction of the parties. The findings and orders of the Secretary are prima facie evidence of the facts therein stated. § 210(f).

Section 228(a) authorizes the Secretary to make rules and regulations to carry out the purposes of the act. Regulations adopted by the Secretary require a market agency to maintain a separate bank account designated as "custodial account for shippers' proceeds," or some similar designation, and make the depositor or market agency a fiduciary, and designate funds in the account as trust funds.

In the reparation proceedings before the examiner, there were parties other than Mid-South and Platte Valley. They are not parties to this appeal because of an intervening bankruptcy. However, they must be identified for purposes of setting forth the factual summary. These parties were Tige Enterprises, Inc. (Tige), and its president and sole stockholder, Gary Berta.

A brief summary of the facts taken from the findings and order and the accompanying record is as follows. On February 2, 7, and 9, 1973, Tige, through Berta, purchased from Mid-South three separate lots of cattle numbering, respectively, 118, 107, and 104 head. The invoices on these purchases, which were separately shipped on the dates above mentioned, provided: "Customers paying for livestock purchased of or through this company by check or draft agree that title does not pass until the funds have actually been received by this company." The motor truck bills of lading consigned the cattle to Tige Enterprises, Inc., in care of Gary Berta, at Platte Valley Livestock, Gering, Nebraska.

When the cattle from the first and second shipments

were delivered at Platte Valley, the cattle were under stress and not fit for sale. The weather was bad, and the yards were wet and muddy. The matter was discussed by Berta and Floyd Engleman, president and sole stockholder of Platte Valley. Engleman suggested that the stressed cattle be placed in pasture on feed and medication, and furnished to Berta some pastureland which he had available. Twenty cattle from the first shipment and all the cattle from the second shipment, except a few that had died, were placed in the pasture along with other cattle which were in similar condition.

When the second load of cattle was shipped from Mid-South's place of business in Mississippi, Mid-South had not received payment for the first shipment. It contacted Berta who indicated the check was in the mail. When the third load arrived at Platte Valley, no payment had been made for any of the cattle shipped.

On February 27, 1973, the approximately 129 head of cattle which had been placed in pasture along with the others, 333 head in all, were sold at Platte Valley by Platte Valley as agent for Tige. At that time Tige and/or Berta was indebted to Platte Valley in the amount of approximately $62,000 on unrelated cattle transactions because of unpaid drafts drawn on Tige. The net proceeds of the February 27th sale, approximately $63,000, were deposited in Platte Valley's custodial account.

On the evening of February 27, 1973, an employee of Mid-South spoke by telephone to Engleman, president of Platte Valley, and made inquiry concerning Tige, informing Engleman that Mid-South had not been paid for the cattle shipped. This conversation spanned approximately 45 minutes.

On February 28, 1973, Platte Valley delivered its check in the amount of $38,483.40 drawn on its custodial account to a bank to which it was indebted because of Tige's unpaid drafts. Tige was named as a payee on the check drawn on the custodial account but did not endorse it.

On March 1, 1973, Platte Valley deposited in its general account a check in the amount of $23,894.77 drawn on its custodial account. Tige was named as a payee on this check but did not endorse it. Later Engleman informed Berta that he need not worry anymore because Tige was no longer indebted to Platte Valley. It is Platte Valley's use of the custodial account to pay itself money owed by Tige on other transactions after it had notice of Mid-South's interest in the cattle which is alleged to constitute the unjust, unreasonable practice declared unlawful by the act.

The essence of Platte Valley's contention in the first issue is that the Secretary of Agriculture had no jurisdiction to enter the order because the transaction was not a "practice" within the meaning of § 208(a), and further urged that the term "ordinarily implies uniformity and continuity, and does not denote a few isolated acts, and uniformity and universality, general notoriety and acquiescence, must characterize the actions on which a practice is predicated." *Guenther v. Morehead*, 272 F. Supp. 721, 726 (S.D. Iowa 1967). It also relies upon various other federal trial court opinions, including *McClure v. E. A. Blackshere Company*, 231 F. Supp. 678 (D. Md. 1964); *Arnold Livestock Sales Company, Inc. v. Pearson*, 383 F. Supp. 1319 (D. Neb. 1974); and the following appellate court opinions, *Hays Livestk. Com'n Co., Inc. v. Maly Livestk. Com'n Co., Inc.*, 498 F.2d 925 (10th Cir. 1974); *Rice v. Wilcox*, 630 F.2d 586 (8th Cir. 1980). In sum, Platte Valley contends the term "practice" is restricted to repetitive acts by the particular individual or company against whom complaint is made.

To support the contrary position, Mid-South also relies upon *Hays Livestk. Com'n Co., Inc. v. Maly Livestk. Com'n Co., Inc., supra*, and, in addition, the federal trial court decision in *Neugebauer v. Ryken*, 34 A.D. 1712 (S.D. S.D. 1975). In this latter case the court, relying upon legislative history of the act, said: "It would defeat the purpose of the Act to hold that the Secretary was devoid of jurisdiction in the instant case

merely because the defendant has not made misrepresentations to the plaintiff or to other purchasers in the past." 34 A.D. at 1716. Mid-South in effect argues that "practice" means acts which may occur within the industry and does not require repetitive action by the individual or company against whom complaint is made.

The Secretary of Agriculture has filed a brief amicus curiae for the purpose of defending the jurisdiction of the Secretary in this case. The Secretary cites and relies upon *Hays Livestk. Com'n Co., Inc. v. Maly Livestk. Com'n Co., Inc., supra; Rice v. Wilcox, supra;* and *Neugebauer v. Ryken, supra,* as well as *United States v. Donahue Bros.,* 59 F.2d 1019 (8th Cir. 1932); *Wickard v. Filburn,* 317 U.S. 111, 63 S. Ct. 82, 87 L. Ed. 122 (1942); and 61 Cong. Rec. 1800, 1801, 1887, 2664, 8310 (1921).

We affirm the judgment of the District Court for reasons hereinafter set forth. In so doing, we will discuss the authorities cited by the parties and by amicus. However, because of the seeming split of authority and the diversity of reasoning within the splits, we think it advisable to begin our analysis with the statutory language itself and the aid of the dictionary.

Most words, including the word "practice," encompass more than one meaning, and the particular meaning intended must be determined from the context in which it is employed. Only two of the multiple meanings of the word practice, as found in the dictionary, can possibly apply in the context of the statute. In Webster's Third New International Dictionary, Unabridged (1968), one meaning is "to make use of: use, employ." Another meaning is "to do something habitually," or "repeated or customary action."

The words of the statute, "and *every* unjust, unreasonable, or discriminatory regulation or practice is prohibited and declared to be unlawful," § 208(a), do not suggest that the word practice includes only that which is done habitually or repetitively by the

particular stockyard or marketing agency. (Emphasis supplied.) Rather, as we will later attempt to demonstrate from an analysis of the cases upon which the parties rely, repetition may be important only in determining whether a particular act is an unjust or unreasonable practice included within the evils which the act was intended to cure.

We look first at the Circuit Court of Appeals opinions. *Hays Livestk. Com'n Co., Inc. v. Maly Livestk. Com'n Co., Inc.*, 498 F.2d 925 (10th Cir. 1974), involved consolidated appeals of three separate cases founded upon reparation orders entered by the Secretary against Maly, a marketing agent, and one Wenzl, a registered and bonded livestock dealer. The facts were that Wenzl purchased livestock from the plaintiffs by drawing drafts on Maly which then sold the cattle on commission. Wenzl had drawn drafts on Maly for about a year before four drafts related to the cattle transactions were dishonored. Maly then applied the proceeds of the sale of cattle to Wenzl's unpaid account with it. Maly's evidence indicated that it had agreed to honor Wenzl's drafts only so long as Wenzl had cattle in Maly's yard to cover the drafts. In each of the cases, Maly had previously honored Wenzl's drafts payable to the three plaintiffs. Among other things the court, in its opinion, noted the Secretary had found it was an unjust and unreasonable practice for Maly to retain the proceeds from the resale of the livestock, knowing the shippers of the livestock had not been paid. We note that in none of these cases had there been a prior rejection of drafts. The court in *Maly* said: "The relevant case law is both controversial and helpful. In Capitol Packing Company v. United States, 350 F.2d 67 (10th Cir. 1965), a case in which we directly reviewed § 213(a) cease and desist orders, we noted the absence of any statutory definition of the critical phrase 'unfair, unjustly discriminatory or deceptive practice'; that its meaning 'must be determined by the facts of each case within the purposes of the Packers and Stockyards Act,' (at 76); and that 'the

responsibility for efficient regulation of market agencies and packers lies with the Secretary of Agriculture . . . . The proper scope of judicial review is limited to the correction of errors of law and to examination of the sufficiency of the evidence supporting the factual conclusions.'" *Maly* at 930. The court also said: "Federal courts have been at pains to point out that the Packers and Stockyards Act did not make of the Secretary a collecting agency. More specifically, the Act was not designed to provide a remedy for every worthless check or dishonored draft. Adams v. Greeson, 300 F.2d 555 (10th Cir. 1962); Guenther v. Morehead, 272 F. Supp. 721 (S.D. Iowa 1967); Lewis v. Goldsborough, 234 F. Supp. 524 (E.D. Ark., W.D. 1964); McClure v. E. A. Blackshere Company, 231 F. Supp. 678 (D. Md. 1964)." *Maly* at 930-31. The court further said: "Relying upon the reasoning in Capitol, Adams, Mahon, and the district court cases, Maly contends that its dishonoring of four drafts in three separate and distinct cases was not a 'practice' prohibited by § 208 of the Act." *Maly* at 931. The court, then noting the case before it, turned on the issue of "an unjust and unreasonable practice by a marketing agency," and said: "Finally, the cited district court cases are distinguishable since we find much more involved in our case than a few 'isolated acts.' In any event, to the extent that the district court cases are not factually distinguishable, we respectfully decline to follow them." *Maly* at 931. The court declined to rely upon a theory of estoppel, i.e., the honoring of prior drafts, and again said: "The Secretary also held, however, that it was unjust and unreasonable for Maly to retain the proceeds from the resale of livestock with knowledge that the shippers of the livestock had not been paid." *Maly* at 932.

We cannot interpret the above case to stand for the proposition that the term practice covers only repeated, habitual, or customary acts. Rather, it merely defines a kind of act which is unjust within the meaning of the statute.

The case of *Rice v. Wilcox*, 630 F.2d 586 (8th Cir. 1980), is in many respects similar to *Maly*. We quote at 588: "Bill Davis, d/b/a Davis Livestock Auction (Davis), was both a market agency selling livestock on commission and a dealer buying and selling livestock for his own account operating on a posted stockyard. Davis was found to have violated 7 U.S.C. § 208 by committing the unjust practice of retaining the proceeds from the sale of cattle owned by Bill and Lois Rice and consigned to him by Wilcox.

"The Secretary of Agriculture found Clenis Wilcox to be operating as a dealer and his failure to pay Rice for livestock purchased was also found to be an unjust practice. Thereafter, the reparation orders were entered, which are the basis for this appeal. We affirm the action of the district court sustaining the reparation orders."

The court, making reference to the "dispute" surrounding the definition of the term "practice," noted that an isolated instance does not constitute a practice, and then said: "In the instant case, after honoring seventeen drafts, two drafts were dishonored. As in *Hays*, there was sufficient recurrence to establish a 'practice.' In so holding we emphasize that isolated transactions do not constitute a practice." *Rice* at 591. The court then concluded by referring to an earlier-mentioned district court opinion, *Neugebauer v. Ryken*, 34 A.D. 1712 (S.D. S.D. 1975), and said: "We agree with Chief Judge Nichol that the purposes of the Act are not served by interpreting the term 'practice' to require several acts of dishonoring checks." *Rice* at 592.

Admittedly, both *Maly* and *Rice* contain language which is ambiguous and when taken in isolation tends to support Platte Valley's definition of "practice." However, when we consider the facts and results in each of the cases, it is clear the repetitive element refers not to the transaction for which relief is given, but to acts preceding the transaction which make the latter unjust or unreasonable. In two of the cases considered in *Maly*

a single dishonored draft was involved. In *Rice* two drafts were dishonored at the same time.

Although *Neugebauer* is a trial court opinion, the Eighth Circuit adopted its reasoning and, therefore, it is necessary to examine *Neugebauer* in order to interpret *Rice*. *Neugebauer* did not involve drafts or checks but did involve a single transaction. In that case the stockyard advertised for sale a group of Angus heifers, representing them to have been bred to Angus bulls. The representation was false. The Secretary entered a reparation order for the payment of money. The judge in *Neugebauer* wrote at 1714-16: "The allegation of lack of jurisdiction is dependent upon the interpretation of the word 'practice' found in Sec. 208 of the Act as amended. Defendant asserts that the action of defendant was a single and isolated incident and not a 'practice' within the meaning of the Act. The United States intervened for the explicit purpose of defending the jurisdiction of the Secretary of Agriculture in this case.

"This Court is persuaded that the action of the defendant was a prohibited 'practice' within the meaning of the Act. The defendant has cited two district court cases in support of the contention that jurisdiction is lacking. McClure v. E. A. Blackshere Co., 231 F. Supp. 678 (D. Md. 1964); Guenther v. Morehead, 272 F. Supp. 721 (S.D. Iowa 1967).

"In *McClure*, the plaintiff had sought enforcement of a reparation order entered upon defendant's refusal to pay for livestock purchased by defendant's agent. The Court found that the Secretary did not have jurisdiction under Sec. 208 of the Act. The opinion was first premised on the basis that nonpayment of a bill did not involve a regulation or practice with respect to the furnishing of stockyard services. The Court stated:

"'It would take the most violent stretching of an elastic imagination to class the nonpayment of a bill as involving a regulation or practice in respect to the furnishing of stockyard services; . . . . *McClure, supra* at 681.'

"The transaction before this Court does not relate to nonpayment of bills or an ordinary debtor-creditor relationship. The Secretary found that defendant, a registered market agency under the Act, had made false representations in the sale of Angus heifers. The Court can conceive of no action by a market agency more inextricably within the term of 'furnishing stockyard services' than representations made by a market agency in the course of an auction sale of livestock at a posted stockyard. Under Sec. 201(b) and (c) of the Act, defendant's actions were clearly in the course of furnishing stockyard services by a registered market agency.

"The Court in *McClure* also found that a single instance of nonpayment of a bill could not be denominated a practice within the meaning of the Act. The Court noted:

"'Practice ordinarily implies uniformity and continuity, and does not denote a few isolated acts, and uniformity and universality, general notoriety and acquiescence, must characterize the actions on which a practice is predicated. *McClure, supra* at 682.'

"Implicit in this analysis was the restriction that there could be only a single actor to establish a practice. The Court finds no such limitation either in the language of the Act or the legislative history. . . .

. . . .

"The above references of legislative history would indicate that the term 'practices' found in Sec. 208 referred to practices within the industry as a whole and not to the practices of a single specific market agency. It would defeat the purpose of the Act to hold that the Secretary was devoid of jurisdiction in the instant case merely because the defendant has not made misrepresentations to the plaintiff or to other purchasers in the past."

We hold that the terms "practice" and "practices" in § 208(a) do not necessarily require repetitive acts. The term "practice" may involve a single transaction if the

unjust or unreasonable practice is among the evils the Packers and Stockyards Act was intended to remedy. The cases upon which Platte Valley relies are sufficiently distinguished in the cases we have just discussed, and we will not elaborate or repeat those distinctions in this opinion. Our holding should not be construed as indicating we disagree with the uniform holding of the cases we have discussed, that the reparation procedure does not give the Secretary jurisdiction as a check-collecting agency. The Secretary of Agriculture had jurisdiction in this case because the act involved was, for the reasons stated in the next section of this opinion, unjust and unreasonable.

The essence of Platte Valley's second contention is that it had the right to offset Tige's obligation to it by appropriating money it held in the custodial account for shippers' proceeds. As we have already noted, the Secretary's regulation adopted pursuant to the act makes the custodial account a trust fund of which the market agency is the trustee. One of the apparent purposes of this regulation is to prevent the market agency from using the trust account to finance its own operations. Concomitant with that purpose is the objective of assuring that the seller of the cattle is paid. *United States v. Donahue Bros.*, 59 F.2d 1019 (8th Cir. 1932).

Under the general law of trusts, a trustee may not offset a debt owing to the trustee individually and not as trustee. Bogert, The Law of Trusts and Trustees § 814 (Rev. 2d ed. 1981), and cases and authorities cited at n. 58. In *United States v. Donahue Bros.*, *supra*, the Eighth Circuit held the conversion or commingling of trust funds was an unjust practice under the act. While the conversion by Platte Valley occurred in a debtor-creditor context, there is no doubt that under the facts in the case, as found by the Secretary, and the absence of any showing that some other party had an interest in the funds Tige owed Platte Valley from prior transactions, Platte Valley, when and if it received payment from Tige, would have been entitled to those funds

individually.

It is, of course, important in this case that the record supports the Secretary's finding that when Platte Valley offset the debt of Tige on February 28 and March 1, it already had notice that Mid-South was the shipper of the cattle and was unpaid. The first fact it knew from the bills of lading; the second, from Engleman's conversation with Mid-South's agent. It therefore knew that Mid-South had an interest in Tige being paid so that it in turn could be paid.

Mid-South had, as we have already noted, reserved in the invoices title until it was paid. Tige's right in the cattle as against the seller (Mid-South) was conditioned on payment. Neb. U.C.C. § 2-507(2) (Reissue 1980). Tige could, however, transfer title to a good faith purchaser. Neb. U.C.C. § 2-403(1) (Reissue 1980). Platte Valley, however, was not a purchaser; it was an agent of Tige, selling on commission. Its rights could rise no higher than those of its principal.

Under the provisions of § 209(a), the market agency is liable for violation of the provisions of § 208(a) to the person or persons injured thereby. Mid-South was injured by the act of Platte Valley in misusing the trust account contrary to the provisions of the act and the regulations promulgated thereunder. Platte Valley's contention that the judgment is not supported by sufficient evidence is not well taken.

The exclusive method of review of reparation orders is by action in the U.S. District Court or the appropriate state court. § 210(f). *Maly Livestock Commission Co. v. Hardin*, 446 F.2d 4 (8th Cir. 1971). The standard of review by the court seems not to have been decided. However, the U.S. Supreme Court has construed provisions of the Interstate Commerce Act substantially the same as § 210(f). *ICC v. Atlantic Coast Line R. Co.*, 383 U.S. 576, 86 S. Ct. 1000, 16 L. Ed. 2d 109 (1966). The Court there held that the commission's findings on issues other than primary jurisdiction issues "are subject to review under the prima facie evidence provision

of § 16(2), with the statutory rights of introducing evidence not before the Commission and obtaining a jury determination of disputed issues of fact." *Id.* at 594. The Court continued in a footnote: "Section 16(2), of course, does not limit the carrier to introducing opposing evidence to rebut the prima facie effect of the Commission's order. It may also challenge the admissibility of the order on the grounds, for example, that the Commission did not afford the carrier a fair hearing or that the order was not based upon substantial evidence .... But if a Commission order containing findings on all matters essential to the shipper's recovery is admitted and the carrier produces no opposing evidence, the findings and order of the Commission may not be rejected by the jury and the shipper is entitled to judgment." *Id.* at 594.

The act makes the findings of the Secretary prima facie evidence of the facts found. § 210(f). There was received in evidence on the motion for summary judgment not only the order and findings of the Secretary, but the record of the entire hearing before the examiner at which both parties presented evidence without restriction. Platte Valley did not, at the hearing in the District Court, offer any additional contradictory evidence or seek a further evidentiary hearing. Under the circumstances, it was proper to determine the matter on motion for summary judgment.

AFFIRMED.

WHITE, J., participating on briefs.